**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

**GARY X. DORSEY,**

        **Plaintiff,**

    **v.**

**LOUIS DEJOY, POSTMASTER
GENERAL, UNITED STATES
POSTAL SERVICE,**

        **Defendant.**

**Case No. 1:18-cv-615
JUDGE DOUGLAS R. COLE
Magistrate Judge Litkovitz**

<u>**OPINION AND ORDER**</u>

This cause is before the Court on the Magistrate Judge's Report and Recommendation ("R&R") (Doc. 61); Defendant, Postmaster General of the United States Postal Service ("USPS"), Louis DeJoy's Objections (Doc. 63) to that R&R; and, separately, Plaintiff's Counsel, Firooz Namei's, Motion to Withdraw (Doc. 71).

The R&R recommends that the Court grant in part and deny in part Defendant USPS's Motion for Summary Judgment (Doc. 40) on Plaintiff Gary Dorsey's ("Dorsey") claims, which generally sound in disability discrimination and retaliation. For reasons stated more fully below, the Court **ADOPTS IN PART** and **REJECTS IN PART** the R&R's recommendations (Doc. 61). The Court accordingly **GRANTS IN PART** and **DENIES IN PART** Defendant USPS's Motion for Summary Judgment (Doc. 40), but as to somewhat different claims than the R&R recommends. Specifically, the Court **GRANTS** USPS's Motion (Doc. 40) with respect to: (1) Dorsey's termination-related discrimination claim (contrary to the R&R); (2) Dorsey's non-selection-related discrimination claim (in accord with the R&R); and (3) Dorsey's

failure to accommodate claim related to his 2013 employment as CCA (contrary to the R&R). The Court **DENIES** USPS's Motion (Doc. 40) with respect to Dorsey's (1) termination-related and (2) non-selection-related retaliation claims (in accord with the R&R as to both).

The Court further **GRANTS** Counsel Firooz Namei's Motion to Withdraw (Doc. 71).

## BACKGROUND

A. **Factual Background.**

1. **Dorsey's 2013 Employment With USPS.**

Gary Dorsey, an African-American male, began working as a City Carrier Assistant ("CCA") for the United States Postal Service's ("USPS") Westwood Post Office in Cincinnati, Ohio, in May of 2013. During all relevant times, Dorsey was in the three-month "probationary" period of his employment. (Dorsey Dep., Doc. 36, #234). On June 3, 2013, about a month into his employment, Dorsey received a performance review which graded his performance in six categories: work quantity, work quality, dependability, work relations, work methods, and personal conduct. At that time, Dorsey received three "unacceptable" ratings, in the categories of work quantity, work quality, and dependability. (*Id.* at #213–14). Dorsey states, however, that his discussions with management, and specifically supervisors Elmer Schmalle and Katrina Baker-Calmeise, suggested only that he needed to "pick it up" and move faster, and that otherwise he was "doing fine." (*Id.* at #215–17, 220). He testified that his understanding was that such feedback was common for new CCAs. (*Id.*).

2

On June 27, 2013, Dorsey fell while completing his route when a portion of stairs in front of a home collapsed. Dorsey immediately called Baker-Calmeise, who transferred his call to Schmalle. (*Id.* at #223). Dorsey told Schmalle that he "had an accident on some steps" and that he had "hurt [his] knees and [his] ankle." (*Id.* at #224). Dorsey says that during the same phone call he indicated to Schmalle that he "was having problems … stepping up on the curb" and walking in uneven grass, and that traversing hills and steps was "very difficult for [him]." (*Id.* at #253). Viney Smith, another supervisor, was dispatched to take pictures of the home where the injury occurred. Dorsey also spoke to Smith, telling her that he "was in pain" but "wanted to finish [his] route." (*Id.* at #254; *see also* Smith Dep., Doc. 50, #1353).

When Dorsey returned to the post office that evening, he spoke with Schmalle and told Schmalle he wanted to see a doctor about his injury. (*See* Dorsey Dep., Doc. 36, #254–55). At that same meeting, though, with a union representative present, Dorsey indicated that he would be "okay," and he acknowledges that he did not immediately seek medical treatment. (*See* Incident Report, Dorsey Dep. Ex. 5, Doc. 36-5, #276). However, Dorsey says that, outside the presence of the union representative, Schmalle indicated that if Dorsey reported his injury "to Workman's Comp or anyone that [Dorsey] might as well turn in [his] bag and [his] badge, that [he] would be fired." (Dorsey Dep., Doc. 36, #249–50; *see also* Smith Dep., Doc. 50, #1335 ("Mr. Schmalle told me that he told Mr. Dorsey concerning an injury that— and I don't know verbatim, that if it were reported, that he could be fired.")). Dorsey suggests that it was Schmalle's statement that caused Dorsey to forgo medical

treatment. (Dorsey Dep., Doc. 36, #225). Schmalle, for his part, specifically denies ever telling Dorsey he could be fired if he reported the injury. (Schmalle Dep., Doc. 51, #1445–46; *but see* Smith Dep., Doc. 50, #1335). Schmalle says that at the same time Dorsey was discussing seeing a doctor, Dorsey downplayed any pain, saying that he would "be fine." (Schmalle Dep., Doc. 51, #1456).

Dorsey also states that he requested, at least from Schmalle and another supervisor, Neal Gilday, an "easier route to accommodate [his] … knees, [his] injury." (Dorsey Dep., Doc. 36, #262). Schmalle allegedly did change Dorsey's route, but Dorsey testifies that it was "still a difficult route" in that it had "a hill and steps." (*Id.* at #263). Schmalle, on the other hand, testifies that Dorsey never apprised him of a knee injury, nor did Schmalle say anything to Gilday about a knee injury. (Schmalle Dep., Doc. 51, #1442, 1444). Schmalle acknowledges, though, that Gilday, as the morning supervisor, was the supervisor who would assign routes. (*Id.* at #1442).

On July 3, about a week after his injury, Dorsey received another written performance evaluation on the same six categories. (Empl. Eval., Doc. 39-4). This time, he received all unsatisfactory ratings. (*Id.*). He indicates that he did not receive an in-person performance review at that time. (*See* Dorsey Dep., Doc. 36, #257–58). On July 9, Baker-Calmeise met with Dorsey and told him that he would be separated from work with the USPS due to poor performance. (*Id.* at #260; Pl. Corrected Resp. to Def. Prop. Undisputed Facts, Doc. 60-1, #1924 ("Plaintiff admits that he was terminated by Baker-Calmeise on 7/9/2013.")). Dorsey says at that time that he "told her that, [she] already [knew]" his "situation." (Dorsey Dep., Doc. 36, #260). Dorsey

during the July 9 separation meeting stated he wasn't making his times "due to his injury," which he "sustained on June 27." (Management's Contentions re: Union Grievance, Doc. 45-1, #534). Baker-Calmeise testifies that Dorsey's injury was first brought to her attention "at the separation process," that is, apparently on July 9th. (*See* Baker-Calmeise Dep., Doc. 53, #1588). Dorsey did not receive written notice of his separation in the mail until July 20, though it was dated July 9. (*See id.*; Not. Of Separation, Dorsey Dep. Ex. 4, Doc. 36-4, #275).

The day after the separation meeting, Dorsey initiated an injury claim by submitting the Federal Employee's Notice of Traumatic Injury form (Form CA-1). (Doc. 39-11). Schmalle signed that form on July 11, indicating that notice was received on July 10, and noting that Dorsey "ha[d] not provided medical." (*Id.* at #430). Dorsey visited a physician with the Office of Workers' Compensation on July 15, 2013. That physician diagnosed an ankle fracture and a knee sprain, and suggested certain restrictions on Dorsey's physical activities at work. (Attending Phys. Rep., Doc. 39-16, #444). He also noted that the "period of total disability" would end on September 1, and that Dorsey could resume regular work on September 2, 2013. (*Id.*).

Dorsey received disability benefits from the Office of Workers Compensation beginning in August 2013 and continuing through at least 2016. (*See* Pl. Corrected Resp. to Def. Prop. Undisputed Facts, Doc. 60-1, #1947; EEO Dispute Resolution Specialist's Inquiry Report, Doc. 46-10, #926). Dorsey filed a formal EEO complaint related to his termination as a CCA on October 24, 2013. (Doc. 46-1).

5

Although Dorsey "admits that he was terminated by Baker-Calmeise on 7/9/2013," (Pl. Corrected Resp. to Def. Prop. Undisputed Facts, Doc. 60-1, #1924), the USPS did not finalize his separation until approximately April 2014. (*See* USPS Email, Doc. 45-1, #598–603; Pl. Corrected Resp. to Def. Prop Undisputed Facts, Doc. 60-1, #1931 (noting Dorsey was still "on the rolls at least until February 12, 2014"; that his "last day in pay status was September 13, 2013," and that "his termination was not processed until April 23, 2014")).

## 2. Dorsey's 2015 Application And Non-Selection For Mail Handler Assistant.

In late 2015, Dorsey applied for another position at USPS, this time as a Mail Handler Assistant ("MHA"). (Application, Doc. 39-17, #446). His application for that position indicated he was still employed by USPS, though he was not, and that his reason for wanting to leave that job was "Industrial Accident/Medical." (*Id.* at #447). He interviewed for the new position with Tammy Barnes on December 11, 2015. (Interview Sheet, Doc. 39-18, #457). During the interview, he corrected certain misstatements on his application, including the statement that he was still working for the USPS. Barnes recommended him for hire "[p]ending history 2013/14." (*Id.*). Barnes premised her conditional recommendation on the assumption "that [his] previous boss [would give] a good recommendation." (Barnes Dep., Doc. 52, #1523). About a week later, Dorsey received a "conditional" job offer for the MHA position via email. (Conditional Job Offer, Doc. 39-20). That email noted the offer was contingent on Dorsey "meeting medical and security investigation requirements," and advised Dorsey not to "resign from [his] current job." (*Id.* at #467).

6

This conditional offer did not last long. About a week after he received the conditional offer email, Lisa Butts, a USPS field recruiter, informed Dorsey by phone that he had not been selected for the MHA position. (Butts Dep., Doc. 49, #1163–64; Attachment to EEOC Compl., Doc. 46-10, #934 ("On or about December 27, 201[5], I was advised by Lisa Butts that I was not selected for the position ….")).

What transpired between the time Dorsey received the conditional offer email and the time Butts called Dorsey to tell Dorsey he had not been selected is the subject of some dispute. The R&R summarizes USPS's version this way:

> [USPS] Operations Support Specialist, Kevin Reynolds, spoke with Supervisor of Customer Service Support, Amy Daugherty, to obtain information about plaintiff. (*See* Reynolds Aff., Doc. 39-22, #476, 478; Daugherty Dep., Doc. 56 at 11:8-13:21). Ms. Daugherty in turn contacted Station Manager Baker-Calmeise, who informed her that plaintiff "was not eligible for rehire" based on "poor performance during his probation period." (Daugherty Dep., Doc. 56 at 13:22-15:2). Ms. Daugherty relayed this information to Mr. Reynolds. (Reynolds Aff., Doc. 39-22, #476, 478; Daugherty Dep., Doc. 56 at 18:2-9). Mr. Reynolds contacted Plant Manager David Caproni and asked whether he would be interested in hiring someone who had been previously terminated, and Mr. Caproni replied that he was not interested in a hire not recommended by the Customer Service department. (Reynolds Aff., Doc. 39-22, #478; Caproni Aff., Doc. 39-24, #484, 486). Mr. Reynolds then relayed Mr. Caproni's assessment to Ms. Butts, who understood plaintiff's non-selection to be related to plaintiff's prior work history. (Reynolds Aff., Doc. 39-22, #478; Butts Dep., Doc. 49, #1164–65).

(R&R, Doc. 61, #1966–67).[1] Dorsey characterizes the affidavits and testimony supporting this narrative as "self[-]serving," "contradictory," "biased," and "speculative at best." (Pl. Resp. to Def. Prop. Undisputed Facts, Doc. 60-1, #1938–40). He further claims that, during the call from Butts, she specifically "mentioned"

---

[1] Ms. Daugherty's deposition does not include PAGEID numbers.

Dorsey's prior EEO activity arising out of his earlier separation. (Dorsey EEO Aff., Doc. 46-12, #958).

According to Dorsey, the prior-work-history rationale for Dorsey's non-selection arose only after Dorsey filed a new EEO charge related to his non-selection. In particular, Dorsey filed an EEO pre-complaint related to the non-selection on February 2, (Doc. 46-10, #933), and a formal EEO Complaint related to his non-selection on April 18, 2016 (*see id.* at 922). USPS finalized the rescission of Dorsey's conditional offer sometime after March 31, 2016. (Mar. 31, 2016, Email, Doc. 45-1, #660).

## B. Procedural Background.

Dorsey filed suit on August 31, 2018. (Compl., Doc. 1). The then-assigned Judge referred the case to Magistrate Judge Litkovitz. (Order Referring Case, Doc. 3, #47). Shortly after, Dorsey amended his Complaint. (Am. Compl., Doc. 5). In that amended Complaint (which is the now operative Complaint), Dorsey alleges race discrimination under Title VII; disability discrimination, failure to provide reasonable accommodation, and failure to engage in the interactive process, all under the Rehabilitation Act; discrimination for use of leave under the Family Medical Leave Act ("FMLA"); and retaliation for engaging in various activities protected under Title VII, the Rehabilitation Act, and the FMLA. (*Id.* at #56–58). In the course of the summary judgment briefing described below, though, Dorsey withdrew his Title VII race discrimination and FMLA claims, (Pl. Resp. in Opp. to Mot. for Summ.

J. ("Opp'n"), Doc. 57, #1796, 1796 n.1), although he still argues that he was retaliated against for EEO activity, a protected activity under Title VII.

That left for the Magistrate Judge's consideration: (1) Dorsey's termination-related discrimination claim under the Rehabilitation Act; (2) his non-selection-related discrimination claims under the Rehabilitation Act;[2] (3) his failure to accommodate claim under the same statute related to his stint as CCA; (4) his failure to accommodate claim related to his non-selection for the MHA position; (5) his retaliation claim based on his termination from the CCA position; and (6) his retaliation claim based on his subsequent non-selection for the MHA position. Dorsey also included in his response a reference to Defendant's "interference in [Dorsey's] participation in the ADA process," which he appeared to assert as an independent claim. (*See id.* at #1796 ("At this time, plaintiff … will address only disability discrimination under The Rehabilitation Act, interference in his participation in the ADA process, and retaliation stemming from his protected activity including EEO activity and request for reasonable accommodation.")).

### 1. USPS Moves For Summary Judgment.

Defendant USPS moved for summary judgment on August 14, 2020. (Mot. for Summ. J. ("Mot."), Doc. 40). In its motion, USPS argued that Dorsey failed to

---

[2] The ADA defines "disability" to include both in fact having an impairment and "being regarded as having" an impairment. 42 U.S.C. § 12102(1)(A), (C). Dorsey's Response in Opposition to summary Judgment contains passing references to USPS having "perceived" Dorsey as disabled, which might be interpreted to argue that he falls under the "regarded as" prong of the definition. (*See* Doc. 57, #1800, 1803). However, the R&R did not consider these passing references to preserve such an argument, (Doc. 61, #1976), and, in any case, Dorsey waived any "regarded as" claim at oral argument.

establish a prima facie case of disability discrimination under the Rehabilitation Act. Most importantly for purposes of this Opinion, USPS argued that Dorsey was not a qualified individual with a disability and that, even assuming for purposes of argument his disabled status, Dorsey could not show that USPS knew or had reason to know of a disability. (*Id.* at #493–94).

As to whether Dorsey was suffering a "disability" under the Act at the time of his termination, USPS argued that he was not because he had not yet seen a doctor nor been diagnosed with a condition, and because his injuries were "by their very nature temporary." (*Id.* at #494). On the notice front, USPS argued that Dorsey had not given any indication that his walking troubles would be anything other than temporary. To the contrary, he had told USPS that he would be "okay." (*Id.*). Accordingly, USPS says it "did not know, and had no reason to know, of any limitations imposed by any alleged disability" at the time that it decided to terminate him. (*Id.* at #495).

USPS also argued that Dorsey's failure to accommodate claim under the Rehabilitation Act fails because he "simply never requested an accommodation." (*Id.*). It follows, according to USPS, that USPS cannot be liable for failure to engage in the interactive process, because the triggering event—Dorsey's request—never occurred.

Finally, USPS argued that Dorsey could not succeed on his retaliatory non-hire claim under the Rehabilitation Act because he had failed to produce evidence sufficient to support a causal connection between protected activity and an adverse

action. (*Id.* at #503).[3] USPS says that "standing alone as proof of retaliatory action are Plaintiff's own self-serving statements that Ms. Butts told him that upper management was sent records of his prior EEO activity." (*Id.* at #504). But, according to USPS, there is no evidence that any medical or EEO records were "actually sent" to management, nor that they played any role in the decision. (*Id.*).

### 2. Dorsey Responds In Opposition.

For his part, Dorsey responded that he was in fact disabled under the meaning of the Act, and that USPS had notice of his disability. Dorsey contends that the injuries are not "temporary, and the record shows the disability is permanent." (Opp'n, Doc. 57, #1801). He goes on to state that "[h]e has a musculoskeletal problem that substantially restricts major life functions including standing, walking, lifting, and carrying," and that he "suffered an avulsion fracture to his ankle and knee injuries." (*Id.* at #1802). He also argues that USPS was on notice of a disability because he reported the fall when it occurred on June 27, 2013. (*See id.*). He states that he indicated to both Schmalle and Smith that he "was having difficulty keeping up his speed because of the injury." (*Id.*). He also points to the fact that he "asked Mr. Schmalle for an easier route" because of his pain and difficulty walking.  (*Id.*).

Dorsey also argues that there is "at least a question of fact" as to whether he requested an accommodation, noting that an employee need not "use any magic language and may use [plain] language to request accommodation." (*Id.* at #1804).

---

[3] USPS did not explicitly address the claim that Dorsey suffered a retaliatory action with respect to his initial termination.

As for the causal connection element of his retaliation claim, Dorsey points to (1) a series of internal USPS emails that were sent between January and March 2016; (2) his own affidavit regarding the reasoning Butts gave him for his non-selection during their late December conversation; and (3) the alleged inconsistencies of Ms. Butts' "story" regarding the reason for Dorsey's non-selection. (*Id.* at #1812). On the latter count, Dorsey argues that Butts initially told him he was not selected because of "what Baker-Calmeise told [the USPS decisionmakers]," but that her story "changed" when she later indicated it was due to "performance issues." (*Id.*).

### 3. The R&R Recommends Granting In Part And Denying In Part USPS's Motion For Summary Judgment.

The R&R concluded that Dorsey had raised a genuine dispute of material fact on all four issues: the existence of his disability, USPS's notice of the disability, his request for accommodation, and the cause of his 2015–16 non-selection. First, the R&R noted that the ADA and, by extension, the Rehabilitation Act, should not require "extensive analysis" as to whether an employee has a disability. (R&R, Doc. 61, #1974–75 (quoting 29 C.F.R. § 1630.2(j)(1)(iii)). The R&R did not explicitly discuss whether USPS was on notice of a disability, but implicitly determined that USPS had notice by concluding that Schmalle's comment that Dorsey "would be fired if he reported his disability" constituted direct evidence of discrimination. (*Id.* at #1973–74).

The R&R also concluded that Dorsey had requested an accommodation, relying in part on the following portion of his deposition testimony:

> Q. Did you ask for any accommodation from Elmer Schmalle or Katrina Baker?
> A. I did. I asked --
> Q. Or Neal [Gilday]?
> A. Yeah. I asked all three. Katrina --
> Q. What did you ask?
> A. I asked for an easier route to accommodate my, you know, my knees, my injury, and Neal [Gilday] told me he could see what he could do, but he's given me what he has.
> Q. So, did he give you accommodation?
> A. No.
> Q. All right. What about Mr. Schmalle, did he give you accommodation?
> A. What he thought he was giving me.
> Q. Did he give you accommodation?
> A. No.

(Dorsey Dep., Doc. 36, #262–63).

Finally, the R&R found that Dorsey's affidavit statement "that Ms. Butts referenced his EEO activity" when notifying him of his non-selection, combined with the internal USPS emails sent in the following days and months, could be reasonably considered circumstantial evidence of a causal connection between his EEO activity and the rescission of his conditional offer. (R&R, Doc. 61, #2000). The R&R characterized the emails as "investigat[ing] plaintiff's history, his injury/compensation status, and identify[ing] him as a potential [reasonable accommodation committee] candidate." (*Id.*). Although the emails occurred after Dorsey was notified of his non-selection, the R&R "constru[ed]" the timeline in Dorsey's favor, implicitly concluding that the formal rescission of the conditional offer—sometime after March 31, 2016—was the adverse employment action, and that the emails therefore could shed light on the cause of that action.

Altogether, the R&R (1) denied summary judgment with respect to Dorsey's termination-related disability discrimination claim; (2) granted summary judgment

with respect to his non-selection-related disability discrimination claim; (3) denied summary judgment with respect to his CCA-related failure to accommodate claim; (4) considered waived Dorsey's non-selection-related failure to accommodate claim; and denied summary judgment with respect to (5) his termination-related and (6) non-selection-related retaliation claims.

USPS timely objected (Doc. 63) to the R&R, Dorsey responded to those objections (Doc. 65), and USPS, having been granted leave to do so, replied to Dorsey's response (Doc. 68). The matter is now before the Court.

## LEGAL STANDARD

If a party objects within the allotted time to a report and recommendation, the Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C); see also Fed. R. Civ. P. 72(b). Upon review, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with

significant probative evidence to support its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to search the record sua sponte for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). Instead, the nonmoving party must "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex Corp.*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the

15

court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

The Court starts with a threshold matter, namely whether the USPS has provided sufficiently specific objections to the R&R to warrant review. Dorsey says no, but the Court disagrees. A proper objection must be specific enough "to enable the district court to discern those issues that are dispositive and contentious." *Miller v. Currie*, 50 F.3d 373, 380 (6th Cir. 1995) (citing *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 508–09 (6th Cir. 1991)). In its objections, USPS points to what it believes are errors of law and application thereof, supported by references to the R&R and record citations. The objections, while numerous and wide-ranging, are not (contrary to Dorsey's contention) "obscure, diffuse," or non-specific. (*See* Resp. to Obj., Doc. 65, #2024–25). As such, USPS has, for the most part, preserved for review by this Court the objected-to portions of the R&R.

That being said, the parties further disagree about another preliminary matter—the standard of review this Court should employ in resolving those objections. Dorsey suggests that, because the R&R recommended denying summary judgment on most of his claims, this was not a "dispositive" matter, and therefore the Court should employ a "clearly erroneous or contrary to law" standard. (Pl. Resp. in Opp. to Obj., Doc. 65, #2027 (citing FRCP 72(a))). USPS, on the other hand, urges application of the "de novo" standard because the R&R "was dispositive of at least one of Plaintiff's claims, and the Motion for Summary Judgment itself clearly moved

16

for a dispositive ruling on all of the claims." (Def. Reply in Supp. of Obj., Doc. 68, #2059). According to USPS, the standard of review does not "depend[] on the Magistrate Judge's Recommendation," but rather on whether the underlying motion does or does not seek dispositive relief. (*Id.*). The Court agrees with USPS on this issue, and thus applies a de novo standard of review to those portions of the R&R to which USPS properly objected. *See* 28 U.S.C. § 636(b)(1)(C).

That leaves, however, the unobjected-to portions of the R&R. That is, Dorsey offered no objection to (1) the R&R's recommendation to grant summary judgment on Dorsey's disability discrimination claim challenging his non-selection for the MHA position, (2) the R&R's failure to consider his "ADA interference" claim, nor (3) its conclusion that he had waived any non-selection-related failure to accommodate claim.

The R&R advised Dorsey that failing to object within 14 days could result in forfeiture of rights on appeal, which includes the right to District Court review. (*See* Doc. 61, #2001). *See also Thomas v. Arn*, 474 U.S. 140, 152 (1985) ("There is no indication that Congress, in enacting § 636(b)(1)(C), intended to require a district judge to review a magistrate's report to which no objections are filed."); *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019) (noting "fail[ure] to file an objection to the magistrate judge's R&R … is forfeiture"); 28 U.S.C. § 636(b)(1)(C).

Nonetheless, although Dorsey did not object, the advisory committee notes to Federal Rule of Civil Procedure 72(b) suggest that the Court still must "satisfy itself that there is no clear error on the face of the record in order to accept the

17

recommendation." *See also Mavrakis v. Warden*, No. 5:17 CV 2398, 2018 WL 4104187, at *3 (N.D. Ohio Aug. 28, 2018) (reviewing for clear error absent an objection to a Magistrate Judge's R&R); *Mason v. Comm'r of Soc. Sec.,* No. 1:10 CV 2456, 2011 WL 3022016, at *1 (N.D. Ohio July 22, 2011) (same); *Malone v. Nike*, No. 2:18-cv-02505-TLP-cgc, 2020 WL 4106316, at *2 (W.D. Tenn. July 20, 2020) (same).

The Court has reviewed the R&R and determined that it does not contain "clear error on [its] face" with respect to any of the unobjected-to conclusions or recommendations. Fed. R. Civ. P. 72(b) (advisory committee notes). Thus, the Court **ADOPTS** the R&R's recommendation to grant summary judgment on Dorsey's disability discrimination claim relating to his non-selection for the MHA position, and accordingly **GRANTS** USPS's Motion (Doc. 40) in that respect. And, consistent with the R&R, the Court likewise does not consider any "ADA interference" or failure to accommodate claim relating to his non-selection.

But that still leaves the objected-to portions of the R&R. And there are a lot of them. Indeed, USPS objects as to all the claims on which the R&R recommends denying summary judgment. In an effort to promote clarity and efficiency, the Court will group and consider these objections claim by claim.

## A. USPS Is Entitled To Summary Judgment On Dorsey's Discriminatory Termination Claim Under The Rehabilitation Act.

As to Dorsey's termination-related disability discrimination claim, USPS makes three related arguments: (1) that the R&R misapplied Sixth Circuit precedent by conflating the direct- and indirect-evidence frameworks, (2) that the Magistrate Judge mischaracterized the statement from Elmer Schmalle as "direct evidence," and

(3) that, applying the indirect-evidence framework, Dorsey failed to establish a prima facie case. The Court considers these objections in turn.

### 1. The Report Erred in Concluding That Plaintiff Presented Direct Evidence of Disability Discrimination.

USPS first objects that the R&R "confuses the Sixth Circuit's paths of analysis" for a discrimination claim by "searching for direct evidence in Plaintiff's pretext argument." (Obj., Doc. 63, #2008). But the Court need not separately consider that objection, because USPS next raises a related, and more salient, objection. That is, USPS argues Schmalle's statement that Dorsey "might as well turn in [his] bag" if he reported his injury does not constitute direct evidence of discrimination as a matter of law. (See Obj., Doc. 63, #2008–12). The Court agrees that this evidence is not direct evidence of disability discrimination.

Direct evidence is that which "proves the existence of a fact without requiring any inferences." *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006) (quoting *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004)). In the context of discrimination, direct evidence, "if believed, *requires* the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (emphasis added) (citing *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). That is, direct evidence "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice *against members of the protected group*." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (internal citations omitted) (emphasis added).

19

In this case, Dorsey alleges disability discrimination under the Rehabilitation Act, and thus can establish that claim by introducing evidence "that the employer relied upon [Dorsey's] disability in making its employment decision ...." *Mitchell v. U.S. Postal Serv.*, 738 F. App'x 838, 843 (6th Cir. 2018) (quoting *Roetter v. Mich. Dep't of Corrs.*, 456 F. App'x 566, 569 (6th Cir. 2012)). Importantly, as noted by USPS, "direct evidence generally cannot be based on isolated and ambiguous remarks." *DiCarlo v. Potter*, 358 F.3d 408, 416 (6th Cir. 2004) (citing *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 382 (6th Cir. 2002)). However, when even isolated or ambiguous remarks are made "by an individual with decision-making authority, such remarks become relevant in determining whether there is enough evidence to establish discrimination." *Id.*

Here, Dorsey points to Schmalle's alleged statement that Dorsey "might as well turn in [his] bag and [his] badge" if he reported his injury to Workers' Compensation. (Dorsey Dep., Doc. 36, #250). However, this comment alone does not constitute direct evidence of disability discrimination—regardless of whether Schmalle was a decisionmaker. This is particularly true when considered together with Dorsey's more complete statement in his EEO Complaint: "[Schmalle] told me that if I reported this as a work related injury, I might as well turn in my bag *because it would be looked at as my fault*." (Dorsey EEO Addendum, Doc. 46-1, #821 (emphasis added)).

As noted above, direct evidence is that which requires no inference to conclude that the employer made an employment decision based on prejudice against members of a protected class. In this case, that protected class consists of persons with a

20

disability as defined by the Rehabilitation Act. But Schmalle's comment, even if taken as true, does not "require[] the conclusion" *see Grizzell*, 461 F.3d at 719, that USPS considered Dorsey's (alleged) disability in the decision to terminate him. Even viewed in its strongest form (that Dorsey would be fired if he reported an injury to Worker's Compensation), the comment does not suggest that USPS believes he cannot do his job because of a disability, or that any purported disability renders him able to do only lesser jobs. Instead, the comment focuses on the act of *reporting* the injury, rather than reflecting animus regarding the injury itself.[4] While terminating an employee for reporting a work-related injury to Workers' Compensation may be direct evidence of *retaliation* (insofar as reporting an injury to Workers' Compensation constitutes protected activity), it is not direct evidence of *disability* discrimination.

Because the Court concludes that the comment by Schmalle does not constitute direct evidence of disability discrimination, the indirect-evidence framework is the proper method by which to analyze Dorsey's discriminatory termination claim. Under that framework, a plaintiff must show that (1) he is disabled as that term is used in the Rehabilitation Act; (2) he is otherwise qualified for the position, with or without reasonable accommodation; (3) he suffered an adverse employment action; (4) the employer knew or had reason to know of his disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced. *Spence v. Donahoe*, 515 F. App'x 561, 567 (citing *DiCarlo*, 358 F.3d at 418).

---

[4] Indeed, even if Schmalle's comment constituted a "threat" of termination for reporting an injury to Workers' Compensation, the undisputed facts show that Baker-Calmeise notified Dorsey of his separation before Dorsey made any such (formal) report.

The fifth element of the prima facie case may also be established with evidence showing that "similarly situated non-protected employees were treated more favorably." *Id.* at 567–68 (quoting *Jones v. Potter*, 488 F.3d 397, 404 (6th Cir. 2007)).

Applying the indirect-evidence framework to Dorsey's termination-related disability discrimination claim de novo, the Court considers the arguments raised in USPS's Motion for Summary Judgment (Doc. 40). There, USPS conceded that Dorsey suffered an adverse employment action, but attacked every other prong of Dorsey's prima facie case: the existence of his disability, his qualification for the position, USPS's knowledge of his disability, and whether other, non-protected employees were treated more favorably. (*See generally* Mot., Doc. 40, #493–98).

### 2. Dorsey Fails To Create A Genuine Dispute Of Material Fact As To Whether He Had A Disability As Defined By The Rehabilitation Act When He Was Terminated.

In its Motion (Doc. 40), USPS argues that Dorsey failed to establish he was suffering a disability at the time of his termination. And, with respect to its objections (Doc. 63), USPS argues that the R&R erred in concluding otherwise.

The Rehabilitation Act (the "Act") prohibits discrimination against qualified individuals with a disability in federal agencies and other programs receiving federal funding. *Bent-Crumbley v. Brennan*, 799 F. App'x 342, 344 (6th Cir. 2020). As such, whether Dorsey in fact suffers a disability is a threshold inquiry. *Id.* at 345.

The Act incorporates the Americans with Disabilities Act's ("ADA's") definition of disability, which is "(A) a physical or mental impairment that substantially limits one or more major life activities ...; (B) a record of such an impairment; or (C) being

regarded as having such an impairment ...." *Id.* (citing 42 U.S.C. § 12102(1)(A)–(C)). Of these three avenues to disability, however, Dorsey is limited to the first. Because Dorsey never advanced a "record of" theory of disability, and because he waived any "regarded as" theory at oral argument, the Court considers only the "actual disability" prong of the definition: whether Dorsey had "a physical … impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

In this case, USPS appears to concede, and properly so, that Dorsey had a "physical impairment." That is, the parties do not seriously dispute that, following his fall, Dorsey was suffering at least from a fractured ankle and two knee sprains, if not chondromalacia, all of which are "impairments." (*See* Mot., Doc. 40, #494 (conceding plaintiff's "physical conditions" but arguing that they are "temporary")). But an impairment, in and of itself, does not suffice. Rather, to constitute a "disability," the impairment also must "substantially limit" one or more "major life activities." 42 U.S.C. § 12102(1)(A).

On that front, USPS principally argues that the impairment, or impairments, at issue here were not substantially limiting because Dorsey's injuries were "temporary conditions." (Mot., Doc. 40, #494 (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002))). Fifteen years ago, that argument, without more, may have sufficed. Before Congress passed the Americans with Disabilities Amendments Act of 2008 ("ADAAA"), the ADA's implementing regulations expressly instructed courts to consider, among other things, (i) the duration or expected duration of the impairment, and (ii) the permanent or long term impact of or resulting

23

from the impairment, as part of the "substantially limits" inquiry. *See* 29 C.F.R. § 1630.2(j)(2) (2008). And, based on these regulations, pre-ADAAA case law "overwhelmingly require[d] that, for an individual to fall within the scope of the Rehabilitation Act, he must have [had] *a permanent, longterm impairment.*" *Spence v. Potter*, No. 1:07-CV-00526, 2010 WL 518179, at *6 (S.D. Ohio Feb. 3, 2010) (emphasis added), aff'd sub nom. *Spence v. Donahoe*, 515 F. App'x 561 (6th Cir. 2013) (citing, e.g., *Agnew v. Heat Treating Servs. of Am.*, 2005 WL 3440432, at *4 (6th Cir. Dec.14, 2005) and *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 938 (6th Cir. 2000)). That approach reflected the broader principle that, "prior to the 2008 amendments to the ADA, the term 'substantially limited' was 'interpreted strictly to create a demanding standard for qualifying as disabled.'" *Spence*, 515 F. App'x at 570 (quoting *Toyota Motor Mfg.*, 534 U.S. at 197).

Congress changed this calculus, though, through the ADAAA. In particular, Congress expressly overturned *Toyota Motor* and intentionally lowered the threshold for "substantial limitation." ADAAA, Pub. L. No. 110-325, § 2, 122 Stat. 3553 (2008). In doing so, "Congress … directed [courts] to construe the Act 'in favor of broad coverage.'" *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 447 (6th Cir. 2018) (quoting 42 U.S.C. § 12102(4)(A)). Under the regulations now implementing the ADAAA, an "impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii). As the R&R correctly notes, "[t]he

24

threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis." *Id.* at § 1630.2(j)(1)(iii).

Nevertheless, three salient points remain. First, although the ADAAA lowered the threshold of "substantial impairment," it did not remove it entirely. *See* 29 C.F.R. § 1630.2(j)(1)(ii) ("[N]ot every impairment will constitute a disability within the meaning of this section."). Thus, a plaintiff "who states that a medical condition caused her some pain and discomfort, but who offers no evidence at all of any concomitant impairment in her activities, must be held to have failed to state an ADA claim under either the pre- or post-amendment standard." *Moen v. Genesee Cnty. Friend of the Ct.*, No. 2:08-cv-12824, 2009 WL 1953056, at *6 (E.D. Mich. July 6, 2009).

Second, a court may still, even after the Amendments, consider the duration or expected duration of an impairment as one factor in determining whether substantial impairment exists. *See, e.g.*, *Jenkins v. Chicago Transit Auth.*, No. 15 C 08415, 2020 WL 868535, at *4 (N.D. Ill. Feb. 20, 2020). For example, while the relevant regulation states that "an impairment lasting or expected to last fewer than six months can be substantially limiting," 29 C.F.R. § 1630.2(j)(1)(ix), the associated interpretive guidance nonetheless clarifies that "[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity. Impairments that last only for a short period of time are typically not covered …." 29 C.F.R. Pt. 1630 (App'x); *see also Veldran v. Dejoy*, 839 F. App'x 577, 579–80 (2d Cir. 2020) (summary order) (finding plaintiff's knee sprain,

25

which caused limitations in walking, working, and climbing steps for only four days, "was of such a short duration and limited severity that it could not qualify as a disability").

Finally, and perhaps most importantly here, the relevant comparator group for assessing "substantially limits" remains "most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii); *see also, e.g.*, *Morrissey v. Laurel Health Care Co.*, 946 F.3d 292, 299 (6th Cir. 2019) (quoting regulation); *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 853 (6th Cir. 2018) (same). That is, imagine a person who routinely runs marathons for exercise, but then develops an impairment of some sort that prevents them from running more than twenty miles at a clip. That impairment may "substantially limit" the person's ability to run as compared to that person's own pre-impairment abilities, or even as compared the average marathoner. But such an impairment would not meet the test for a disability, as it would not substantially limit the person's ability to run "as compared to most people in the general population." 29 C.F.R. § 1630.2(j)(1)(ii). *Cf.  Doherty v. Nat'l Bd. of Med. Examiners*, 791 F. App'x 462, 464–65 (5th Cir. 2019) (rejecting comparison of plaintiff's reading ability to that of "other students her age or college-educated students," because those groups do not constitute "the general population"); *see also Wong v. Regents of Univ. of California*, 410 F.3d 1052, 1066 (9th Cir. 2005) (plaintiff's poor reading comprehension, as compared to "his own reading comprehension ability without time limits, or to others in his academic peer group" did not present evidence "that he was

substantially limited in his ability to read for purposes of daily living, or as compared to what is important in the daily life of most people").[5]

Of course, it is also important to note that the "substantially limited" test does not exist in the abstract. Rather, it must be applied in the context of the plaintiff's proposed "major life activities." In other words, the inquiry is whether the impairment substantially limits a major life activity, and it is the plaintiff's job to identify that major life activity (or activities). *See Williams v. Stark Cnty. Bd. of Cnty. Comm'rs.*, 7 F. App'x 441, 445 (6th Cir. 2001) (court must "identif[y] the life activity that the plaintiff relies upon and determines whether it constitutes a major life activity"); *accord Mancini v. City of Providence*, 909 F.3d 32, 42 (1st Cir. 2018) ("[I]t is the plaintiff's burden to identify the major life activity that is affected.") (citation omitted).

Moreover, the test is applied as of the time that the adverse employment action (here the termination) occurred. *See Bush v. Donahoe*, 964 F. Supp. 2d 401, 417 (W.D. Pa. 2013) ("[W]ith regard to the 'actual disability' prong, the test is whether, *at the time of the adverse employment action*, the limitation caused by the impairment was 'substantial.'") (emphasis in original); *Schmidt v. St. Elizabeth Med. Ctr.*, No. 2:18-cv-110 (WOB-CJS), 2020 WL 6492912, at *9 (E.D. Ky. Nov. 4, 2020).

---

[5] Both *Wong* and *Doherty* apply the standard for "actual disability" under the ADA. *See Wong*, 410 F.3d at 1063; *Doherty*, 791 F. App'x at 464. Additionally, although *Wong* was decided well before passage of the ADAAA, the relevant comparator group for the "substantially limited" inquiry remains the same. The Court does not rely on *Wong* for any other part of its reasoning.

Here, Dorsey advances four activities that he says are impacted by his "musculoskeletal problem": standing, walking, lifting, and carrying. (Opp'n, Doc. 57, #1802). In providing that list, he starts on firm footing, as there is no question that standing, walking, and lifting are major life activities; indeed, they are specifically included in the statute's exemplary list of major life activities. 42 U.S.C. § 12102(2)(A) ("[M]ajor life activities include, but are not limited to … walking, standing, [and] lifting …."); *see also* 29 C.F.R. § 1630.2(i)(1)(i). And the Court assumes for purposes of this Motion that "carrying" is also a major life activity.

But things get a little trickier on the issue of whether Dorsey has created a genuine dispute as to whether he is substantially limited as to any of the four. As to that question, Dorsey presented, and the R&R relied on, four pieces of evidence: (1) a U.S. Department of Labor Workers' Compensation form signed by an orthopedic physician on July 29, 2013 (Doc. 46-9, #919); (2) a June 13, 2014, opinion from Dr. E. Gregory Fisher that plaintiff had chondromalacia, which "pre-exist[ed]" the fall but had been aggravated by the fall and had now become chronic and permanent (Doc. 47-5, #1063); (3) a September 4, 2014, letter from Dr. Marc Schneider reflecting permanent restrictions due to chondromalacia of the patella and a left closed fractured lateral malleolus, conditions Dr. Schneider determined arose on the date of Dorsey's fall (Doc. 47-6, #1065); and (4) a December 2015 Medical Assessment completed by Dr. Schneider (Doc. 47-3, #1059). (R&R, Doc. 61, #1975–76).

Let's start with the latter three. The Court concludes that none of the three, whether alone or in combination, supports a finding that Dorsey was "substantially

28

limited" as to any of his four proposed major life activities at the time of his separation. The June 2014 letter from Dr. Fisher—in addition to coming over a year after Dorsey's notice of separation—cites "no restrictions for the accepted work-related conditions," and notes that Dorsey was at that point "capable of performing" CCA duties. (Doc. 47-5, #1063). The September 2014 doctor's note says that Dorsey was placed on "permanent restrictions" as of July 2014, but does not elaborate on what those restrictions are, and thus provides no evidence as to the proffered activities. (Doc. 47-6, #1065). And the December 2015 Medical Assessment by Dr. Schneider indicates that the restrictions resulting from the conditions include "no lifting more than 75 [pounds]," and "no climbing." (Doc. 47-3, #1059). The Court is not prepared to hold that limitations on lifting over 75 pounds and "climbing" substantially limit the proposed major life activities here, and in any case, those restrictions arose from an examination made over two years after Dorsey's notice of separation.

The Workers' Compensation form, on the other hand, is a closer call, at least with regard to the major life activity of "walking." It reflects an examination date just a few days after Dorsey's notice of separation, and could be read as evidence that Dorsey was restricted to "walking" only one hour per eight-hour workday.[6] (Doc. 46-9, #919). Although, as USPS stresses, this examination did not occur prior to Dorsey's termination, (Obj., Doc. 63, #2012), the nearness in time nonetheless permits a

---

[6] The Court notes that this form is not the model of clarity and, indeed, may be subject to multiple interpretations. However, the R&R seemingly understood it to "significantly limit[]" plaintiff's work activities. (R&R, Doc. 61, #1975). Further, on summary judgment, the Court resolves the matter of competing inferences in favor of the non-moving party.

reasonable inference that the limitations that it documents, to the extent they existed, existed on or before July 9, 2013, the date of his separation.

At the same time, however, the R&R did not consider this medical evaluation in its entirety—and understandably so, given that the Magistrate Judge was not directed to the portion of the record containing the complete form. The first page of the evaluation, titled "Attending Physician's Report," indicates that the restrictions would last *only until September 1, 2013*, and that the physician did not expect any "permanent effects" as a result of the injury. (Doc. 39-16, #444). Thus, at least as of July 29, 2013, Dorsey's one-hour walking limitation was expected to last less than two months.

Beyond the July 2013 medical evaluation, the Court must also consider Dorsey's own testimony regarding various statements he claims to have made to his employer around the time of the adverse employment action, including as to the pain and discomfort he reported that he felt when walking. *See* 29 C.F.R. § 1630.2(j)(1)(v) (clarifying that "comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis").

For example, Dorsey told Schmalle on the day of the injury that he was "having problems" stepping up onto curbs and walking in uneven grass, and that walking up and down hills and steps was "very difficult." (Dorsey Dep., Doc. 36, #252–53). He told Schmalle on the phone that he had hurt "[his] knees and [his] ankle," and reports he told Viney Smith he was having difficulty "walking, stepping up [on] curbs," and

"walking on uneven surfaces." (*Id.* at #224, 254). He also told Smith when she came to take photos of the steps that he was "in pain" but that he "wanted to try to finish [his] route." (*Id.* at #254).

At the same time, Dorsey's testimony regarding his post-injury *conduct* also provides further context for assessing the extent of any limitation in his ability to walk. According to Dorsey, even after his injury, and just days before the examination that resulted in the one-hour-per-day walking limitation, he could ably complete a six-hour mail route, at least so long as the route was a "flatter," "easier" one than his normal route. (*See* Dorsey Dep., Doc. 36, #240 ("Q. Were you able to complete your route at all between the time that you injured yourself and when you were separated? A. They gave me a more flatter route that was a little easier. I made good time.").

Given the sum total of the record evidence, while it is perhaps a close call, the Court concludes that Dorsey has failed to create a genuine dispute as to whether he was substantially limited in terms of his ability to walk.[7] While the bar is admittedly

---

[7] Admittedly, Dorsey's impairments may have affected his ability to perform as a letter carrier. But, if Dorsey's tacit argument is that the impairment impacted the major life activity of "working," that falls short, too. First, he never expressly advanced that argument, and so, as a procedural matter, he has likely waived it. But, even had he advanced it, that argument would fail. The Sixth Circuit has held that, when a plaintiff asserts a major life activity of "working," to establish the "substantially limits" part of the definition of "disability," the plaintiff must show that his impairment "limits [his] ability to 'perform a class of jobs or a broad range of jobs.'" *Booth v. Nissan N. Am., Inc.*, 927 F.3d 387, 394 (6th Cir. 2019) (quoting *Tinsley v. Caterpillar Fin. Servs., Corp.*, 766 F. App'x 337, 342 (6th Cir. 2019)). "The inability to perform a single, particular job does not constitute a 'substantial limitation.'" *Wolfe v. U.S. Steel Corp.*, 567 F. App'x 367, 372 (6th Cir. 2014) (citing *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002)). Even if Dorsey has established that his temporary impairments prevented his successful performance as a USPS mail carrier (at least on routes that included hills), he has offered no evidence that these impairments would limit his employment in a class of jobs or a broad range of jobs.

low, "not every impairment will constitute a disability within the meaning of" the statute. *Id.* at (j)(1)(ii). In other words, even under the ADAAA, there is a difference between a transitory injury, that is expected to heal fully in a short period of time, and a disability.[8] And here, the undisputed evidence shows that, at the time of the termination, any limitations on Dorsey's ability to walk were the result of transitory injuries—a knee sprain and ankle fracture—that were expected to heal fully within two months, and that, even during this two-month period, Dorsey could complete a six-hour daily walk carrying a mailbag, at least so long as the route he covered was flat. On those facts, the Court finds that a jury could not reasonably conclude that Dorsey was "substantially limited" "as compared to most people in the general population," *id.*, with regard to his ability to "walk." The ADAAA lowered the hurdle, but it did not remove it entirely, and Dorsey fails to clear it here.

### 3. Dorsey Fails To Create A Genuine Dispute Of Material Fact As To Whether USPS Was Aware Of His Disability When He Was Terminated.

Separately, because Dorsey has advanced an "actual disability" theory, "the burden of proof and persuasion is on [Dorsey] to establish that [USPS] had knowledge of [his] actual disability." *Hembree v. Off. of Dist. Att'y Gen. for 13th Jud. Dist. of Tenn.*, No. 2:18-cv-00097, 2020 WL 4586176, at *3 (M.D. Tenn. Aug. 10, 2020) (citing *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1105 (6th Cir. 2008)). This inquiry is crucial because, unless the employer is on notice of a disability, "it would

---

[8] That is not to suggest that workers suffering from injuries, including on-the-job injuries, do not also have rights. But those rights typically would arise under statutes such as the Family and Medical Leave Act, or workers' compensation laws, rather than disability discrimination laws.

be impossible for the [employer] to have made its decision *because* of the disability, let alone *solely because of* the disability,'" as is prohibited by the Rehabilitation Act. *Burns v. City of Columbus*, 91 F.3d 836, 844 (6th Cir. 1996) (emphasis in original).

USPS argues that, even if Dorsey was suffering a legally-defined disability when Baker-Calmeise notified him of his separation, USPS did not know or have reason to know of any such disability at that time. (Mot., Doc. 40, #494). In support of that argument, USPS insists that Dorsey "did not present his supervisors with any medical documentation showing physical restrictions," nor did he "tell any of his supervisors or managers that he was disabled, impaired, or was having pain or difficulty due to an injury." (*Id.*).

Typically, an employer has notice of an employee's disability when the employee tells the employer that he is disabled. *Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). Of course, a plaintiff need not specifically use the word "disabled" or "disability." *See Leeds v. Potter*, 249 F. App'x 442, 449 (6th Cir. 2007) (request for accommodation need not include the words "accommodation" or "disability") (citation omitted). But the employer "must know enough information about the employee's condition to conclude that he is disabled. Relevant information could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions." *Cady v. Remington Arms Co.*, 665 F. App'x 413, 417 (6th Cir. 2016) (citations omitted). And, consistent with the discussion above, for USPS to conclude that Dorsey was "disabled," Dorsey must

33

"show that a supervisor knew that he had an 'impairment that substantially limits one or more of the major life activities.'" *See Leeds*, 249 F. App'x at 450 (citing 42 U.S.C. § 12102(2)).

In other words, it is not enough that the employer knows that an employee was injured or otherwise had an impairment. Rather, the employer must know that the injury or impairment was of sufficient magnitude to substantially limit one or more major life activities. Or, as the Sixth Circuit put it, "[k]nowledge of an employee's symptoms … does not necessarily equate to knowledge of his disability." *Nilles v. Givaudan Flavors Corp.*, 521 F. App'x 364, 369 (6th Cir. 2013) (citing *Hammon*, 165 F.3d at 450). For example, in *Nilles*, the employer knew that the employee-plaintiff "had taken two leaves of absence, each for less than a month and separated by over a year, and that [the employee] was seeing several doctors and had had an MRI." *Id.* But that was not enough to put the employer on notice of the employee's disability. *Id.* According to the Sixth Circuit, that information did not "strongly imply" that the employee had a "disability"; rather, it was "just as, if not more, consistent with the perception that [the employee] simply was suffering from one or more temporary illnesses." *Id.*; *see also Burns*, 91 F.3d at 844 (employer must know that the "symptoms were caused by a disability *as defined by law*") (emphasis added).

Thus, although symptoms alone *might* put an employer on notice of a disability, those symptoms must be "severe enough to alert" the employer as to that fact, or in other words, severe enough to provide the employer either actual knowledge or "some generalized notion" of a disability. *Nilles*, 521 F. App'x at 369; *see*

*also Hedberg v. Ind. Bell Tel. Co., Inc.*, 47 F.3d 928, 934 (7th Cir. 1995) ("[I]t may be that some symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability.").

Here, Dorsey has failed to establish that Schmalle, Baker-Calmeise, or any other supervisor had enough information to know or reasonably infer that Dorsey was suffering from a disability as defined by law. USPS knew, of course, about Dorsey's fall, and that Dorsey was experiencing some related pain and difficulty walking. And, crediting the narrative resulting from Dorsey's sworn testimony, at least Schmalle, if not others, knew that Dorsey had hurt his knees and ankles, and was contemplating visiting a doctor. Dorsey further asserts he affirmatively told Schmalle, Gilday,[9] and Baker-Calmeise (the relevant decisionmakers) that he wanted "an easier route to accommodate [his] … knees, [his] injury." (Dorsey Dep., Doc. 36, #262).[10]

Based on these facts, however, the Court concludes that a reasonable jury could not find that the information available to USPS put it on notice of the existence of a disability as contemplated by the Rehabilitation Act. Dorsey himself did not learn of any diagnosis until sometime after July 9th, and finding an employer to be on notice

---

[9] Dorsey's testimony is somewhat inconsistent with respect to whether he requested any route change from supervisor Neal Gilday. (*Compare* Doc. 36, #262 ("Q. Did you ask for any accommodation from Elmer Schmalle or Katrina Baker … [o]r Neal? A. Yeah. I asked all three."), *with* Doc. 36, #265 ("Q. Did … Neal send you [to the reasonable accommodation committee]? A. Me and Neal never talked at all on that. He just knew that I was injured during my route.")).

[10] Dorsey's Opposition suggests that he used the word "disability" when requesting an easier route. (Doc. 57, #1802 ("Mr. Dorsey asked Mr. Schmalle for an easier route because of the pain he was experiencing and disability [*sic*].")). However, that claim is not accompanied by a record citation, and Dorsey's testimony does not support that characterization. Rather, he testifies that he asked for "an easier route to accommodate [his] … knees, [his] injury." (Dorsey Dep., Doc. 36, #262).

of a potential disability when the employee himself is unaware of any diagnosable impairment does seem "a stretch." *See Smith v. Grattan Fam. Enters., LLC*, No. 08-CV-14314, 2009 WL 3627953, at *11 (E.D. Mich. Oct. 30, 2009) ("Plaintiff's own testimony establishes that at the time that Defendant declined to rehire him, even he didn't know about his disability. To claim that Defendant should nonetheless have divined this is too far a stretch.").

Dorsey argues that his failure to see a doctor prior to the separation meeting "does not excuse Defendants from their requirements under the Rehabilitation Act." (Opp'n, Doc. 57, #1803). But, while it is true that medical documentation is not *required* to put an employer on notice of a disability, neither can the absence of such documentation be ignored. Schmalle, Gilday, and Baker-Calmeise did not have the benefit of a formal diagnosis—or any of the other types of information listed by *Cady*—prior to making the decision to separate Dorsey. *See Cady*, 665 F. App'x at 418 (noting information relevant to the notice inquiry "could include, among other things, a diagnosis, a treatment plan, apparent severe symptoms, and physician-imposed work restrictions"). Although USPS certainly had knowledge of certain symptoms, in that Dorsey told them various supervisors that knees and ankles were hurting, those symptoms fall well short of "severe."

And the magnitude of Dorsey's request to USPS for a work modification was so slight—merely a route with fewer "hills"—that the request likewise would not suggest that Dorsey was "substantially limited" in terms of his ability to walk as that term is used in the ADAAA. To be sure, such a request might have suggested that

36

Dorsey was limited as compared to his own ability to walk prior to his injury, or even, perhaps, that he was limited as compared to other mail carriers. But that does not mean, and accordingly would not signal to the USPS, that he was substantially limited in walking as compared to "most people in the general population," which is the proper comparison group. 29 C.F.R. § 1630.2(j)(ii). Moreover, as discussed above, Dorsey also testified that, even after his fall, he could make "good time" walking approximately six hours per day on flat ground while carrying a mail bag. (*See* Dorsey Dep., Doc. 36, #240). Crediting that testimony, his job performance likewise would not have put his supervisors on notice of any "substantial limitation" on his ability to walk.

In sum, Dorsey's descriptions of the nature of his injuries, coupled with the lack of medical documentation, and Dorsey's own assertions that he could continue to carry mail, at least so long as he had a flatter route, could not have led USPS to conclude that he was substantially limited as to the major life activity of walking, and thus disabled. *Cf. Johnson v. JPMorgan Chase & Co.*, 922 F. Supp. 2d 658, 670 (S.D. Ohio 2013) ("[A]lthough Plaintiff's requests may have put his supervisors on notice that he was experiencing neck pain, they did not make clear that he was making his requests because of a disability. Additionally, in making his requests during this time, Plaintiff did not provide medical documentation to his supervisors relating to his neck condition."). Thus, Dorsey has failed to carry his burden on the fourth prong of his prima facie case.

**4.  Dorsey Fails To Create A Genuine Dispute Of Material Fact As To Whether The Position Remained Open, He Was Replaced By A Non-Disabled Person, Or Similarly-Situated Non-Disabled Employees Were Treated More Favorably.**

Moreover, even assuming that Dorsey succeeded in establishing the other prongs of his prima facie case, Dorsey's termination-related discrimination claim would still fail because he cannot establish the fifth prong: that the position remained open, that he was replaced by a non-disabled person, or that similarly-situated non-disabled employees were treated more favorably. *See Stanciel v. Donahoe*, 570 F. App'x 578, 581 (6th Cir. 2014) (citing *DiCarlo*, 358 F.3d at 418).

Dorsey has provided no evidence his position "remained open" after he was separated, nor evidence that he was replaced by a non-disabled person. As such, he attempts to meet this prong by reference to similarly situated, non-disabled employees who were treated more favorably. (*See* Opp'n, Doc. 57, #1804–05). To be considered "similarly situated," the proposed comparators "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Jones*, 488 F.3d at 405 (quoting *Gray v. Toshiba Am. Consumer Prods.*, 263 F.3d 595, 599 (6th Cir. 2001)).

Although Dorsey proposes specific other USPS employees as comparators in his EEO Affidavit (Doc. 39-7), he fails to make any argument to this effect in his Opposition (Doc. 57). Even if he had, though, the Court would conclude that the two employees he identifies are not proper comparators.

38

In his Affidavit, Dorsey points to USPS employees Jeri Coston and Lisa Ryan. (Dorsey Affidavit, Doc 39-7, #416). Coston was a probationary CCA who was, according to Dorsey, bitten by a dog. (*Id.*). Dorsey asserts that she was treated more favorably because, although she was injured on the job and had received negative performance evaluations, she was given "the proper help needed and forms."[11] (*Id.*).

There are at least two problems with this comparison. First, comparators must have "engaged in the same conduct" as the plaintiff. This refers to the conduct that the employer asserts as its legitimate, nondiscriminatory reason for terminating the employee. Here, that is poor performance. To be sure, both Coston and Dorsey received negative thirty-day evaluations (Dorsey's was perhaps marginally worse, as he received three "unsatisfactory" ratings, compared to two for Coston). (*Compare* Coston Eval., Doc. 39-14, #440, *with* Dorsey Eval., Doc. 39-4, #294). But the performance rating that USPS relied of for the termination decision was the sixty-day evaluation. There, Dorsey received six unsatisfactory ratings. As for Coston, by contrast, there is no evidence that she received a sixty-day evaluation at all, as that section of her form is blank. (Coston Eval., Doc. 39-14, #440). Thus, this evidence does not suggest that her performance was in fact comparable to Dorsey's. Nor has Dorsey offered any other evidence on that issue.

Second, and perhaps more problematic, is Dorsey's assertion that Coston received the "help" and "forms" she "needed" following her injury. Far from raising

---

[11] USPS represents that Coston, too, was terminated "because of poor performance reviews," a fact which would further undercut Dorsey's contention that she was treated more favorably. (Mot., Doc. 40, #498). The record, however, reflects that Coston "voluntarily resigned" on or about September 23, 2013. (Notification of Personnel Action, Doc. 39-14, #439).

an inference of disability discrimination, this in fact suggests that management was *not* predisposed to terminating injured employees due to their injuries. And Dorsey appears to recognize this, indicating in his EEO affidavit that the reason Coston and Ryan were not separated was not because they were "not disabled," but because "both are women." (*Id.*).[12]

As to Ryan, Dorsey says in his affidavit that she was injured on the job but was neither "disciplined nor threatened." (Dorsey EEO Aff., Doc 39-7, #415). That is, he asserts that she was treated more favorably. But the Ryan comparison suffers from the same defect as Dorsey's comparison to Coston: there is no evidence regarding Ryan's relative performance or her similarity to Dorsey in other respects. Rather, Baker-Calmeise's affidavit indicates Ryan was not in a probation period and had worked at USPS for 20 years. (Baker-Calmeise EEO Aff., Doc. 46-4, #904). Moreover, Dorsey goes on to assert that Ryan's injury qualified as a disability, as he says his own does. (Dorsey EEO Aff., Doc 39-7, #415). Thus, the fact that she was *not* terminated (despite being within the same protected class that Dorsey claims to occupy) undercuts, rather than bolsters, Dorsey's claim that he was terminated because of a purported disability. Accordingly, neither the Coston nor Ryan comparison suffices to establish Dorsey's prima facie case.

The only evidence to which Dorsey points in his papers that actually counts as "comparative" is the declaration of Chris Harmon, a USPS union steward. (Opp'n,

---

[12] To the extent that Dorsey is suggesting that he was treated worse because he was male, that would be the basis for, if anything, a sex discrimination claim under Title VII, not an ADA claim. Dorsey did not assert a sex discrimination claim in this matter.

Doc. 57, #1805). Harmon states that he investigated Dorsey's separation and determined that "Dorsey was treated worse than all other CCA's who had similar deficiencies in performance." (Harmon Aff., Doc. 46-15, #1044). But this evidence, even setting aside the potential hearsay problems it might create, *see Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment."), does not satisfy Dorsey's burden. As the R&R recognized, Harmon's statement is not specific enough to carry his burden to identify comparative employees. (R&R, Doc. 61, #1993 ("Mr. Harmon's statement refers to other CCAs generally and does not identify particular comparators.")). Although the "similarly situated" inquiry is relaxed at the prima facie stage (as compared to at the pretext stage), this declaration makes no effort to identify these comparative employees, their supervisors, their respective carrying times, their injury status, or any other relevant similarity or distinction.

In light of Dorsey's failure to establish his prima facie case of discrimination, the Court concludes that his discriminatory termination claim must fail. The Court therefore **SUSTAINS** USPS's Objections (Doc. 63) in this regard, and accordingly **REJECTS** the R&R's (Doc. 61) recommendation. Thus, the Court **GRANTS** Defendant USPS's Motion for Summary Judgment (Doc. 40) as to Dorsey's termination-related discrimination claim.

## B. USPS Is Entitled To Summary Judgment On Dorsey's Failure To Accommodate Claim.

USPS makes substantially the same arguments with respect to the R&R's (Doc. 61) conclusion as to Dorsey's CCA-related failure to accommodate claim as it

did with respect to the discriminatory termination claim. That is, USPS argues that Dorsey failed to establish that he had a disability, that he was otherwise qualified for the CCA position, and that USPS had notice of his disability, if any. (*See* Obj., Doc. 63, #2013–14, 2014 n.3). USPS further argues that Dorsey never requested or demonstrated a need for accommodation. (*Id.* at #2014).

As discussed above, Dorsey has succeeded neither in creating a genuine dispute of material fact as to whether he was suffering a legally cognizable disability at the time of his separation, nor in creating a genuine dispute of material fact as to whether USPS was on notice of that disability. Whether considered under the direct- or indirect-evidence framework, these showings are required for a plaintiff to prevail on a failure to accommodate claim. *See Cheatham v. Brennan*, No. 1:18-CV-295, 2020 WL 5517245, at *2 (S.D. Ohio Sept. 14, 2020) (noting that, under either framework, the plaintiff bears the "initial burden of establishing that an employer failed to accommodate a *known disability*." (emphasis added) (citing *Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) and *Gaines v. Runyon*, 107 F.3d 1171, 1175 (6th Cir. 1997))). Accordingly, USPS is entitled to summary judgment on Dorsey's failure to accommodate claim, and the Court need not consider the Defendant's alternative arguments, including the nettlesome questions of whether Dorsey was "otherwise qualified" and whether he adequately requested an accommodation.

Thus, the Court **SUSTAINS** USPS's Objection (Doc. 63) in this regard and **REJECTS** the R&R's (Doc. 61) recommendation with respect to Dorsey's failure to

accommodate claim. The Court accordingly **GRANTS** USPS's Motion for Summary Judgment (Doc. 40) on that claim.

**C.     USPS Is Not Entitled To Summary Judgment On Dorsey's Termination-Related Or Non-Selection-Related Retaliation Claims.**

Dorsey advances retaliation claims as to both his termination and non-selection. To establish a prima facie case of retaliation under the Rehabilitation Act, Dorsey must show that (1) he engaged in legally protected activity; (2) USPS knew about Dorsey's protected activity; (3) USPS took an employment action adverse to Dorsey; and (4) the protected activity and the adverse employment action were causally connected. *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001) (citing *Wrenn v. Gould*, 808 F.2d 493 (6th Cir. 1987)).

The R&R recommended denying summary judgment as to these claims. USPS argues that, in doing so, the R&R improperly considered inadmissible evidence in the form of Chris Harmon's declaration and "improperly speculate[d]" on the causal connection prong of Dorsey' non-selection-related prima facie case. (Obj., Doc. 63, #2015–19).

**1.     USPS Forfeited Its Argument That The Court Should Not Consider The USPS Union Steward's Declaration.**

Although USPS says the R&R improperly considered the Harmon declaration as "direct evidence" of discrimination, (Obj., Doc. 63, #2015–16), the Court's disposition of the discrimination claim obviates the need to further consider that objection. However, the objection to Harmon's declaration has other implications, as well: the R&R also relied on that declaration in its analysis of Dorsey's termination-

related retaliation claim. Specifically, at the prima facie stage, the R&R considered Harmon's opinion that other mail carriers were treated more favorably than Dorsey notwithstanding similar carrying times and errors to help satisfy his "light" burden on causation. (R&R, Doc. 61, #1992). And, at the pretext stage, the R&R used Harmon's declaration to "cast[] reasonable doubt" on USPS's poor-performance explanation for termination. (*Id.* at #1995).

USPS says reliance on the declaration for these purposes was improper for two reasons. First, USPS says it did not know of the declaration because Dorsey did not give USPS notice of the declaration prior to filing. (Obj., Doc. 63, #2016). Second, USPS argues that under Fed. R. Civ. P. 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." It contends that Harmon's declaration does not pass muster and the Court should therefore disregard it.

The Court need not reach the merits of this objection, however, for one simple reason—the USPS failed to press this argument before the Magistrate Judge. It is black-letter law in the Sixth Circuit that, "while the Magistrate Act, 28 U.S.C. § 631 et seq., permits de novo review by the district court if timely objections are filed, absent compelling reasons, it does not allow parties to raise at the district court stage new arguments or issues that were not presented to the magistrate." *Murr v. United States*, 200 F.3d 895, 907 n.1 (6th Cir. 2000); *see also Quisenberry v. Adams*, No. 20-6069, 2020 WL 8879749, at *4 (6th Cir. Dec. 17, 2020); *Birdsong v. United States*, No.

19-6181, 2020 U.S. App. LEXIS 3732, at *6–7 (6th Cir. Feb. 6, 2020). Here, USPS heads this section of its objections: "The Report [and Recommendation] Should Have Struck the Late-Filed Declaration of a USPS Union Steward." (Obj., Doc. 63, #2015). But USPS never moved to strike the declaration while this matter was pending before the Magistrate Judge. That is a problem.

To be sure, the Court recognizes that the declaration at issue was first submitted in connection with Dorsey's Opposition to USPS's Motion for Summary Judgment. (*See* Harmon Aff., Doc. 46-15, #1044–45; Opp'n, Doc. 57). But it is not at all unusual for parties to support their opposition to such a motion with a declaration or affidavit. The moving party then typically addresses those materials in its reply. Here, though, USPS elected not to file a reply. It attributes its failure to do so (and seemingly, by extension, its failure to object to the declaration that Dorsey attached to his Opposition) to the fact that counsel for USPS was undergoing treatment for a bicycle accident during the relevant time period. (Obj., Doc. 63, #2016 n.6). But there are fairly routine mechanisms by which USPS could have sought an extension of time to reply, if it wanted, and USPS declined to do so. Nor did USPS ever file a separate motion to strike the declaration. In any event, Dorsey notes (and USPS conceded at oral argument) that Harmon was disclosed as a lay witness on Dorsey's December 16, 2019, Designation of Witnesses. (Resp. in Opp'n to Def. Obj., Doc. 65, #2040). Yet, USPS neglected to depose him.

In short, the Court does not find the reasons that USPS offers for its failure to raise this argument before the Magistrate Judge to be compelling. As such, the Court

declines to consider USPS's newly pressed argument, and accordingly **OVERRULES** USPS's objections (Doc. 63) on that ground and **ADOPTS** the R&R's (Doc. 61) recommendation. Thus, the Court **DENIES** summary judgment as to Dorsey's termination-related retaliation claim.

### 2. The R&R Did Not Improperly Speculate On The Causal Connection Between Plaintiff's EEO Activity And His Non-Selection.

In its remaining objection, USPS argues the R&R erred by finding that Dorsey established the causal connection element of his failure-to-hire retaliation claim. (Obj., Doc. 63, #2017–18). This fourth element requires a but-for causal relationship; a plaintiff must "produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" had the plaintiff not engaged in a protected activity. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000) (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997) and *Jackson v. RKO Bottlers*, 743 F.2d 370, 377 (6th Cir. 1984)).

Specifically, USPS argues the R&R erred by allowing Dorsey's retaliation claims to move forward based upon Dorsey's sworn statement that Lisa Butts mentioned his prior EEO activity when she notified Dorsey of his non-selection for the MHA position. (Dorsey EEO Aff., Doc. 46-12, #958).[13] This conversation took place, he says, on or around December 27, 2015. (Information for Pre-Complaint Counseling, Doc. 46-10, #933 ("On or about December 27, 201[5], I was advised by

---

[13] Although not specifically mentioned in Dorsey's Response to USPS's Motion for Summary Judgment, Dorsey asserts in an affidavit that he "told Lisa Butts that [he] had EEO from [his] 2013 termination." (Doc. 55-2, #1748). However, this affidavit does not indicate when he might have given such notice.

Lisa Butts that I was not selected for the position ….). Butts, for her part, avers that she first learned of Dorsey's EEO activity in February or March of 2016, which is after the conversation with Dorsey occurred. (Butts EEO Aff., Doc. 39-19, #459)

Though Ms. Butts denies Dorsey's characterization of their December conversation, and further states that she only learned of Dorsey's EEO activity in February or March, those differing accounts give rise to a dispute of fact, which as a general matter precludes a grant of summary judgment. In fact, USPS concedes the existence of this dispute. (*See* Obj., Doc. 63, #2018 ("Ms. Butts disputes this allegation ….")). The USPS appears to argue, though, that the competing accounts do not give rise to a "genuine" dispute, as Dorsey's affidavit statement in this regard is nothing more than what the USPS terms "unfounded speculation." (*Id.*).

The Court does not agree. Of course, it is true that "unsubstantiated, self-serving assertions will not preclude an adequately supported motion for summary judgment from being granted." *Mosquera v. MTI Retreading Co.*, 745 F. App'x 568, 573 (6th Cir. 2018). But Dorsey's sworn statement that Butts mentioned his EEO conduct when she notified him of his non-selection is neither "unsubstantiated" nor "speculation." Dorsey provides the affidavit based on his personal knowledge as a participant in the conversation at issue. That is properly considered "evidence." *See Bradley v. Wal-Mart Stores E., LP,* 587 F. App'x 863, 867 (6th Cir. 2014) ("As previously discussed, the court deals with evidence, not conclusory allegations, speculation and unsubstantiated assertions.") (*citing Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)). Of course, a jury need not believe Dorsey's version of the

47

events. But, should a jury do so, that would not constitute "pure conjecture" as to what occurred during the call.

This dispute alone would suffice to preclude summary judgment in USPS's favor. The R&R, however, did not rely solely on Dorsey's affidavit. Rather, the R&R combined Dorsey's sworn testimony with "a series of internal USPS emails sent in the days and months following plaintiff's notice of his non-selection." (R&R, Doc. 61, #1998). As to those communications, the USPS argues that the "emails [on which the R&R relies] cannot be shown to demonstrate a causal connection between the EEO activity and the non-selection because they occurred *after the non-selection already occurred*." (Obj., Doc. 63, #2018) (emphasis added). That is, the conversation informing Dorsey of his non-selection occurred sometime in late December 2015, while the emails the R&R cites cover dates between January and March 2016.

The question of whether the emails were properly considered hinges on the date on which the adverse employment action was taken, i.e., the date on which the decision not to hire Dorsey was made. To establish the date of an adverse action, the Sixth Circuit looks to the date on which a decision maker with the requisite authority made the decision to take the adverse action. *Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 736 (6th Cir. 2015); *Burns*, 91 F.3d at 844. In *Yarberry*, the decisionmaker had communicated to another supervisor her decision to terminate the plaintiff early in the afternoon. *Id.* at 736. However, she "appear[ed] to have rescinded that decision after learning that [plaintiff] had been committed to a psychiatric hospital," consulting with two other supervisors about the circumstances surrounding

48

the plaintiff's mental health. *Id.* at 737. This consultation implied "that [the termination decision] was an ongoing process over the course of the afternoon." *Id.* Only later did the decisionmaker decide to "proceed w[ith] term[ination]," which indicated "that she did not regard her initial decision as final and indeed had temporarily halted it." *Id.*

USPS argues by implication that the decision not to hire Dorsey was permanent on or before December 27, the date he was informed of his non-selection. However, there is at least some record evidence that the non-hire decision was not "finalized" during the relevant period of January to March 2016. One of the emails the R&R cites, for example, is dated March 31, 2016, and states that "[s]ince the conditional job offer has already been extended to [Dorsey], in order to not consider him at this point, approval to rescind is being sought." (Doc. 45-1, #660). Confronted with this language, USPS urges the conclusion that "formal rescission of the conditional offer in late 2016 was a mere formality at that point." (Obj., Doc. 63, #2018–19). But while a "mere formality" inference perhaps would be reasonable, the Court must view the evidence in a light most favorable to Dorsey. And in doing so, the Court notes another, equally reasonable inference—that the decision not to hire Dorsey had not yet been made by an individual with the formal authority to make it. *See Yarberry*, 625 F. App'x at 736. The R&R appears to have reached the same conclusion: that the adverse action did not occur until the formal rescission of the offer was complete. (*See* R&R, Doc. 61, #1998 ("Construing these emails and timeline in plaintiff's favor, they could reasonably be considered circumstantial evidence that

elements of his history (e.g., his EEO activity) *led to the rescission of his conditional offer* for the AMH position.") (emphasis added)).

In light of the possibility that a jury could reasonably infer that the adverse decision did not occur until later in time, the R&R did not err in considering the emails. And, in any event, Dorsey's affidavit alone was enough to create a genuine dispute of material fact as to the causal prong of his prima facie retaliation case. As the R&R notes, the plaintiff's burden in establishing the prima facie case of retaliation is "light." (R&R, Doc. 61, #1999 (citing *Gribcheck*, 245 F.3d at 551 ("Although the district court concluded that [plaintiff] did not establish a prima facie case of discrimination, we conclude that he did clear this low hurdle.")). Because Dorsey has created a genuine dispute of material fact as to whether his prior protected activity was causally connected to his non-selection for the MHA position, the Court **OVERRULES** USPS's objections (Doc. 63) on that ground and **ADOPTS** the R&R's (Doc. 61) recommendation. Thus, the Court **DENIES** summary judgment as to Dorsey's non-selection-related retaliation claim.

## D. Plaintiff's Counsel's Motion to Withdraw.

The Court separately considers plaintiff's counsel's motion to withdraw from the case. (Doc. 71). On September 8, 2021, the attorney that filed Dorsey's case, Alissa Sammarco, requested that she be released as attorney of record and that Firooz T. Namei be substituted as plaintiff's counsel. (*See* Doc. 70). Namei entered an appearance on the same day. (Doc. 69).

Two months later, however, Namei filed a motion to withdraw. (Doc. 71). In the attached affidavit, Namei avers he took the case intending that an associate in his office with specific expertise in the employment discrimination field would manage it. (Aff. In Supp., Doc. 71, #2071). That associate now having left the office, Namei says he is without the capacity or specific experience to manage the case. (*Id.*).

Having considered counsel's motion and his reasons therefore, the Court **GRANTS** Namei's motion to withdraw (Doc. 71).

## CONCLUSION

For the reasons above, the Court **ADOPTS IN PART** and **REJECTS IN PART** the R&R's recommendations (Doc. 61). The Court accordingly **GRANTS IN PART** and **DENIES IN PART** Defendants USPS's Motion for Summary Judgment (Doc. 40). Specifically, the Court **GRANTS** USPS's Motion (Doc. 40) with respect to: (1) Dorsey's termination-related discrimination claim; (2) Dorsey's non-selection-related discrimination claim; and (3) Dorsey's failure to accommodate claim related to his 2013 employment as CCA. The Court **DENIES** USPS's Motion (Doc. 40) with respect to Dorsey's (1) termination-related and (2) non-selection-related retaliation claims.

The Court further **GRANTS** Counsel Firooz Namei's Motion to Withdraw (Doc. 71). The Court **DIRECTS** Dorsey to notify the Court of the identity of his new counsel, or, alternatively, whether he wishes to proceed pro se, within twenty-one days of the entry of this Order

**SO ORDERED.**

March 29, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**